IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| ANNA J. CHERNYY, | |
| Plaintiff, | **8:21CV366** |
| vs. | |
| | **MEMORANDUM AND ORDER** |
| MONTY ROESLER, in his official capacity; JOHN DOE I, in his individual and official capacity; ALAN MOORE, in his individual and official capacity; and SALINE COUNTY, | |
| Defendants. | |

This matter is before the Court on Defendants', Alan Moore, Monty Roesler, and Saline County, Nebraska ("County Defendants") motions to exclude the opinions of expert Janet Perdue, Filing No. 117 and Filing No. 131. Also before the Court is a motion for summary judgment, Filing No. 135, filed by County Defendants, who move this Court, pursuant to Fed. R. Civ. P. 56, to grant summary judgment in their favor. Additionally before the Court is Plaintiff's, Anna Chernyy, motion to exclude the expert opinion of Dr. Kirk Newring, Filing No. 139; County Defendants' motion for joinder, Filing No. 149; motion to bifurcate, Filing No. 133; motion to strike, Filing No. 161; and Monty Roesler's, in his individual capacity, motion in limine Filing No. 137[1]. And finally, the Saline County Sheriff, Alan Moore's ("Sheriff Moore") objection to the magistrate judge's order, Filing No. 140.

Plaintiff alleges that Deputy Sheriff Monty Roesler sexually assaulted her, and that assertion is not disputed. She next alleges that Defendants Sheriff Moore, Roesler's

---

[1] Monty Roesler filed this motion in his individual capacity, only, and he has now been dismissed from this lawsuit in his individual capacity, though he remains a party in his official capacity. Accordingly, Filing No. 137 is denied as moot as to Monty Roesler in his individual capacity. *See infra* p. 16 ¶ 7.

supervisor, John Doe 1 ("Supervisor Doe"), and Saline County ("the County") violated her right to be free from cruel and unusual punishment by not guaranteeing her safety and protecting her from violence.

## **BACKGROUND**

Chernyy alleges that in late September and October 2020, she was being held at the Saline County Nebraska Jail ("Saline Jail") while waiting to be transported to the Leavenworth Detention Center. Filing No. 9 at 3. Chernyy was being housed in the A-Pod—an 8-woman pod with no cameras—which consisted of a row of bunk beds on one side of the dividers, and phones, sink, toilets, and showers on the other side. *Id*. Deputy Sheriff Roesler oversaw the detainees in A-Pod during the evenings and nights during the months of September and October 2020. *Id*. During Chernyy's stay in the A-Pod, Roesler sexually assaulted and harassed Chernyy on a number of occasions. *Id*. Roesler used his position of power to intimidate and bribe Chernyy with commissary items and other goods. Chernyy demanded that Roesler stop sexually assaulting her, but he would not. *Id*. at 4. Chernyy did not report the sexual assaults to the Saline Jail staff because she was afraid of retaliation. *Id*. However, one of her co-prisoners did report Roesler's inappropriate behaviors. Once Chernyy was moved to the B-Pod—which had cameras—the sexual assaults stopped. *Id*. Roesler later entered a plea of guilty to a charge of sexual assault in connection with the incident. *Id*. at 5; *see also* USA v. Roesler, Case No. 21cr3010 (D. Neb. July 15, 2021).

Chernyy also alleges that Supervisor Doe and Sheriff Moore failed to prevent, or otherwise stop, Roesler from sexually abusing Plaintiff and other female detainees at the Saline Jail. Filing No. 9 at 5. She asserts that she was not the only female detainee at

the Saline Jail to be sexually abused by Roesler, and alleges he had a history of sexually abusing female detainees at the Saline Jail. *Id.* Further she alleges that other female detainees had reported Roesler's sexual abuses to Supervisor Doe, Sheriff Moore, the Sheriff's Office, and the County. *Id.* She alleges that each defendant knew, or was aware, of facts from which to infer that there was a pattern of sexual abuse, including knowledge of prior litigation over allegations of sexual abuse; the fact that the percentage of inmates sexually assaulted by staff at the Saline Jail was far higher than the national average according to governmental reports; and in 2020, a female Saline Jail guard was relieved of her position due to a consensual sexual relationship with a female detainee in A-Pod. *Id.* Chernyy further alleges Sheriff Moore and Supervisor Doe failed to train and properly supervise Deputy Sheriff Roesler. *Id.* at 7.

Defendants argue that 1) the plaintiff has not alleged that an official policy or unofficial custom caused the assault; 2) the plaintiff has not alleged the officials acted with deliberate indifference to her rights; 3) the plaintiff's allegation that Sheriff Moore and Supervisor Doe knew, or should have known, about Roesler's conduct is conclusory; and 4) the plaintiff's allegation that Sheriff Moore's and Supervisor Doe's failure to train or supervise Roesler actually caused the abuse is not supported by specific factual allegations that either of them had actual knowledge of Roesler's conduct.

## STANDARDS OF REVIEW

### A. SUMMARY JUDGMENT

Summary judgment is appropriate when, viewing the facts and inferences in the light most favorable to the nonmoving party, the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations,

3

stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" show that "an adverse party cannot produce admissible evidence to support" a fact essential to the nonmoving party's claim.  Fed. R. Civ. P. 56(c)(1)(A) & (B).  The plain language of Rule 56(c) mandates the entry of summary judgment after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

"The movant 'bears the initial responsibility of informing the district court of the basis for its motion, and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'"  Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting Celotex Corp., 477 U.S. at 323). If the movant does so, "the nonmovant must respond by submitting evidentiary materials that set out 'specific facts showing that there is a genuine issue for trial.'"  Id. (quoting Celotex Corp., 477 U.S. at 324).  A "genuine" issue of material fact exists "when there is sufficient evidence favoring the party opposing the motion for a jury to return a verdict for that party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251–52 (1986).

The evidence must be viewed in the light most favorable to the nonmoving party, giving the nonmoving party the benefit of all reasonable inferences.  Kenney v. Swift Transp., Inc., 347 F.3d 1041, 1044 (8th Cir. 2003).  "In ruling on a motion for summary judgment, a court must not weigh evidence or make credibility determinations."  Id. "Where the unresolved issues are primarily legal rather than factual, summary judgment

is particularly appropriate." *Koehn v. Indian Hills Cmty. Coll.*, 371 F.3d 394, 396 (8th Cir. 2004). If "reasonable minds could differ as to the import of the evidence," summary judgment should not be granted. *Anderson*, 477 U.S. at 251.

### B. SECTION 1983 LIABILITY STANDARD

To state a claim under § 1983, Chernyy must show "that the defendant(s) acted under color of state law, and (2) that the alleged wrongful conduct deprived [her] of a constitutionally protected federal right." *Green v. Byrd*, 972 F.3d 997, 1000 (8th Cir. 2020). A plaintiff may assert § 1983 claims against a public official acting in his individual capacity and in his official capacity. *Hafer v. Melo*, 502 U.S. 21, 27, 30–31 (1991). When execution of a government's policy or custom inflicts the injury, "the government as an entity is responsible under § 1983." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). A governmental entity is liable under § 1983 only when the entity itself is a "moving force" behind the deprivation. In an official-capacity suit, therefore, the entity's "policy or custom" must have caused the federal law violation. *Monell*, 436 U.S. at 694. Also, because suits against state officials in their official capacity should be treated as suits against the state, the entity's "policy or custom" must have caused the federal law violation. *Id.* at 690–92.

"Personal-capacity suits, on the other hand, seek to impose individual liability upon a government officer for actions taken under color of state law." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). The plaintiff need not allege a governmental "policy or custom" in a personal capacity suit. *Meloy v. Bachmeier*, 302 F.3d 845, 849 (8th Cir. 2002). Instead, supervisor liability under § 1983 is based on some form of actual and direct participation in the constitutional violation. *Id.*

## C. MUNICIPAL LIABILITY

Plaintiff sues Defendants in their official and individual[2] capacities. Where claims are made against public officials such as police officers in their official capacities, such claims are construed as filed against the officers' employing entity. *Elder-Keep v. Aksamit*, 460 F.3d 979, 986 (8th Cir. 2006) ("A suit against a public official in his official capacity is actually a suit against the entity for which the official is an agent."); *Parrish v. Luckie*, 963 F.2d 201, 203 n.1 (8th Cir. 1992) ("Suits against persons in their official capacity are just another method of filing suit against the entity. A plaintiff seeking damages in an official-capacity suit is seeking a judgment against the entity." (citation omitted)).

To prevail on a claim against either the City or County, Plaintiff must show that the constitutional violation resulted from (1) an official "policy," (2) an unofficial "custom," or (3) a deliberately indifferent failure to train or supervise. *Corwin v. City of Indep., MO.*, 829 F.3d 695, 699 (8th Cir. 2016). "Official policy involves 'a deliberate choice to follow a course of action . . . made from among various alternatives' by an official who has the final authority to establish governmental policy." *Jane Doe A By & Through Jane Doe B v. Special Sch. Dist. of St. Louis Cnty.*, 901 F.2d 642, 645 (8th Cir. 1990) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986)). Alternatively, a plaintiff may establish municipal liability through an unofficial custom of the municipality by demonstrating:

> (1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) that plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation.

---

[2] Defendant Monty Roesler is being sued in his official capacity, only.

*Malone v. Hinman*, 847 F.3d 949, 955 (8th Cir. 2017) (quoting *Corwin*, 829 F.3d at 699–700).  A municipal liability claim based on a theory of inadequate training or supervision is simply an extension of a claim based on a "policy" or "custom" theory of municipal liability.  *Marsh v. Phelps Cnty.*, 902 F.3d 745, 751 (8th Cir. 2018).

## DISCUSSION

### A.  STANDARD FOR EXPERT TESTIMONY

Federal Rule of Evidence 702 governs the admissibility of expert testimony and requires that: (1) the evidence must be based on scientific, technical or other specialized knowledge that is useful to the finder of fact in deciding the ultimate issue of fact; (2) the witness must have sufficient expertise to assist the trier of fact; and (3) the evidence must be reliable or trustworthy.  *Kudabeck v. Kroger Co.*, 338 F.3d 856, 859 (8th Cir. 2003).  When faced with a proffer of expert testimony, trial judges are charged with the "gatekeeping" responsibility of ensuring that all expert evidence admitted is both relevant and reliable.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *United States v. Merrell*, 842 F.3d 577, 582 (8th Cir. 2016).  The proponent of expert testimony bears the burden of providing admissibility by a preponderance of the evidence.  *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001).  Testimony is relevant if it is "sufficiently tied to the facts of the case that it will aid  the jury in resolving a factual dispute."  *Daubert*, 509 U.S. at 591.

In the Eighth Circuit, a district court should apply a three-part test when screening expert testimony under Rule 702.  First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact.  This is the basic rule of relevancy.  Second, the proposed witness must be

7

qualified to assist the finder of fact.  Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires.  *Lauzon*, 270 F.3d at 686 (internal citations and quotations omitted).  Expert testimony assists the trier of fact when it provides information beyond the common knowledge of the trier of fact.  *Kudabeck*, 338 F.3d at 860.

To satisfy the reliability requirement, the party offering the expert testimony must show by a preponderance of the evidence "that the methodology underlying [the expert's] conclusions is scientifically valid."  *Barrett v. Rhodia, Inc.*, 606 F.3d 975, 980 (8th Cir. 2010) (citations omitted).  In making the reliability determination, the court may consider:

> (1) whether the theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) whether the theory or technique has a known or potential error rate and standards controlling the technique's operations; and (4) whether the theory or technique is generally accepted in the scientific community.

*Russell v. Whirlpool Corp.*, 702 F.3d 450, 456 (8th Cir. 2012).  Additional factors to consider include: "whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case."  *Polski v. Quigley Corp.*, 538 F.3d 836, 839 (8th Cir. 2008) (quoting *Sappington v. Skyjack, Inc.*, 512 F.3d 440, 449 (8th Cir. 2008)).  "This evidentiary inquiry is meant to be flexible and fact specific, and a court should use, adapt, or reject" these factors as the particular case demands.  *Russell*, 702 F.3d at 456 (citation omitted).

8

When making the reliability inquiry, the court should focus on "principles and methodology, not on the conclusions that they generate." *Kuhn v. Wyeth, Inc.*, 686 F.3d 618, 625 (8th Cir. 2012). However, "conclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997); *see also Russell v. Illinois Cent. R.R. Co.*, No. W201302453COAR3CV, 2015 WL 4039982, at *6 (Tenn. Ct. App. June 30, 2015) (finding Dr. Arthur Frank's causation conclusions based on peer-reviewed scientific studies were not an improper extrapolation—his trial testimony was supported by a rational explanation that reasonable persons could accept as more correct than not correct).

In applying the reliability requirement of *Daubert*, the Eighth Circuit draws a distinction between challenges to a scientific methodology and challenges to the application of that scientific methodology. *United States v. Gipson*, 383 F.3d 689, 696 (8th Cir. 2004). "When the application of a scientific methodology is challenged as unreliable under Daubert and the methodology itself is sufficiently reliable, outright exclusion of the evidence is warranted only if the methodology 'was so altered by a deficient application as to skew the methodology itself.'" *Id.* at 697 (emphasis in original) (quoting *United States v. Martinez*, 3 F.3d 1191, 1198 (8th Cir. 1993)). Generally, deficiencies in application go to the weight of the evidence, not its admissibility. *See id.* "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001) (quoting *Hose v. Chicago Nw. Transp. Co.*, 70 F.3d 968, 976 (8th Cir. 1995)).

9

"Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. "[C]ases are legion" in the Eighth Circuit that "call for the liberal admission of expert testimony." *Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 562 (8th Cir. 2014). "As long as the expert's scientific testimony rests upon 'good grounds, based on what is known' it should be tested by the adversary process with competing expert testimony and cross–examination, rather than excluded by the court at the outset." *Id.* (quoting *Daubert*, 509 U.S. at 590).

District courts are "not to weigh or assess the correctness of competing expert opinions." *Johnson*, 754 F.3d at 562. The jury, not the trial court, should be the one to "decide among the conflicting views of different experts." *Kumho Tire Co.*, 526 U.S. at 153. Medical experts often disagree on diagnosis and causation and questions of conflicting evidence must be left for the jury's determination. *Hose*, 70 F.3d at 976.

1. **MOTION IN LIMINE TO EXCLUDE OPINIONS OF JANET PERDUE, Filing No. 117**

Defendants Saline County, Nebraska, Alan Moore, in his individual and official capacities, and Monty Roesler, in his official capacity only, by and through their counsel, move the Court for an order in limine excluding Janet Perdue's opinions and prohibiting her from testifying in support of any of Plaintiff's claims. Ms. Perdue's opinions are fundamentally unsupported and can offer no assistance to the jury.

Filing No. 117, at 1. Generally, Ms. Perdue's opinions are:

1. Jail staff could have enhanced its policies and procedures.
2. The Jail should have used cameras in A-Pod.
3. The Jail could have had a counting system that used two guards to complete the count instead of one guard.
4. The Jail could have fired Monty Roesler in 2016 (four years before he assaulted Ms. Chernyy), instead of reprimanding him after he accepted a note and drawing from a detainee.
5. Ms. Chernyy was not offered sufficient follow-up services after the assault.

10

*Id.* at 1.  Defendants argue that Perdue's opinions are irrelevant and inherently unreliable because:

> 1. By her own admission, her opinions is [sic] based solely on her "common sense" as opposed to something founded in applicable policies, regulations, or other areas which require expert knowledge.
> 2. Perdue relied upon Federal Bureau of Prison standards to render her opinion despite her also admitting that the standards so not apply to the Jail because it is not under the Bureau of Prison's jurisdiction.
> 3. Perdue was unaware of any sort of policies or procedures regarding prisoner counting or using cameras in Nebraska jails.
> 4. Ms. Perdue was unaware as to any Nebraska policies regarding termination, reprimanding, or suspension of employment for prison guards/officials.
> 5. Plaintiff does not plead a deliberate indifference medical treatment claim.
> 6. Ms. Perdue's opinions do not lend any support to Plaintiff's municipal liability claim.

*Id.* at 2.

Perdue admits the Saline Jail "successfully met the standards of an announced Prison Rape Elimination Act (PREA) audit."  Filing No. 118 at 1; Filing No. 118-5 at 15–18, Perdue Depo. 43:4–24; 44:1–46:7).  Also, Defendants argue that Perdue's opinions are based only on "common sense" and not any correctional standards the Jail failed to meet.

To prevail on a claim alleged against a county, a plaintiff must show that the constitutional violation resulted from (1) an official "policy," (2) an unofficial "custom," or (3) a deliberately indifferent failure to train. *Corwin*, 829 F.3d at 699.  Also, "the plaintiff must show not only that a policy or custom existed, and that it was casually related to the plaintiff's injury, but that the policy itself was unconstitutional." *Luckert v. Dodge Cnty.*, 684 F.3d 808, 820 (8th Cir. 2012) (citations omitted).  Defendants argue Perdue's "common sense" opinions do not support these requirements.

11

Perdue currently works as a Corrections Consultant specializing in the area of Federal Corrections. Filing No. 118-6 at 5. She has also provided expert witness testimony while employed by the Federal Bureau of Prisons on institutional operational issues. Id. As an Independent Consultant she provides consulting services on all aspects of the Federal Prison System for private attorneys, Federal Public Defenders Offices, individuals, and family members of those facing the possibility of serving a federal prison sentence or those individuals who have already been sentenced or incarcerated. Id. She began her career as a probation officer and then moved to prisons where she served for 34 years. Id. She worked as a correctional officer with the inmates, then moved to field training, followed by Assistant Correctional Programs Administrator, and then an Executive Assistant for the Regional Director, working from a regional office in Kansas City, KS. Id. She also conducted auditing processes to include those employed by the American Correctional Association ("ACA"), of which she is a member. Id. She served as Associate Warden for eight years at the Metropolitan Correctional Center, Chicago, Illinois, housing approximately 750 offenders. Id. She was responsible for the day-to-day activities of ensuring offenders made prompt court appearances while also providing a safe environment for staff and offenders to work while affording programming opportunities for the inmate population. Id. Towards the end of her career, Perdue worked in the Residential Reentry Centers. Id. She managed a region encompassing seven federal sentencing districts, over $25 million in contract awards annually, involving bed space of 800+ offenders. Id.

Chernyy contends that Perdue has 34 years of experience, with part of that time as an associate warden. Filing No. 128 at 2. Perdue's use of the words "common sense"

during her deposition was an interchangeable term to account for her 34 years' experience as a seasoned warden/jailer who knows the innerworkings of, and how to properly run, a correctional facility with both male and female inmates so that it not only protects the community, but the inmates and its staff as well. *Id*. When giving her deposition testimony, Perdue had not yet been permitted to tour the jail and did not have that information when expressing her opinions at that time; nor did she have Jeff Carter's expert opinion and discovery materials. *Id*.

As for Perdue's opinions on whether internal policies, for example E-500, were followed or not, Perdue stated:

> I agree with the defense expert, Jeffrey Carter, that Alan Moore violated his own internal written procedures with respect to PREA training and did not employ any or all the strategies that would reinforce agency policy regarding sexual assault/sexual abuse by leadership staff.

Filing No. 158 at 2.

> This would include staff training, education through agency publications or newsletters, etc. Specifically, no such steps were taken following the incident with Monty Roesler in 2016, the training required for the years 2017 and 2018, required by E-500, was not completed as there was no documentation disclosed in discovery to suggest that staff attended this training.

Filing No. 128 at 13–14 (citations omitted).

Based on the evidence presented at this point, the Court finds the motion to exclude the expert testimony of Ms. Perdue should be denied. Based on her experience, she is clearly qualified to give opinions in this case. As the testimony emerges, if the defendants believe Ms. Perdue's testimony falls outside of her expertise or lacks foundation or relevance, the defendants may raise the question at that time.

2. **MOTION IN LIMINE TO EXCLUDE UNDISCLOSED OPINIONS BY PERDUE, Filing No. 131**

Defendants move to either exclude or strike undisclosed opinions by Perdue. These include opinions related to ACA certification; opinions regarding flirtation as the beginning of most inappropriate relationships in prisons; excerpts from a bulletin published by the PREA Resource Center addressing the issue of camera viewing in open dormitories; and opinions regarding "sound correctional practices and judgment."  The Court has reviewed this motion and finds it should be denied.  These subparts are a result of Perdue's supplemental expert report, following her review of the jail and Jeffrey's disclosures and deposition.   As such, the Court finds they should not be excluded at this time.   These are issues that should be raised and discussed at trial as the relevant evidence is received.  Accordingly, the motion in limine is denied at this time.

3. **MOTION TO BIFURCATE, Filing No. 133**

Defendants move to bifurcate the trial into two parts:  liability and damages. Defendants argue they will be prejudiced if the jury considers the punitive damages issue during the liability and compensatory damages phase of the trial and before the jury first decides whether Sheriff Moore acted with "evil intent."  The plaintiff disagrees and does not wish to bifurcate.  The Court has reviewed the arguments and law cited by the parties, as well as the facts, and determines that the motion should be granted.  For "convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues . . .."  Fed. R. Civ. P. 42(b).  Punitive damages are among the issues that courts have discretion to bifurcate. *See Thorne v. Welk Inv., Inc.*, 197 F.3d 1205, 1213–14 (8th Cir. 1999).  Accordingly, this motion will be granted.  However, the punitive damages trial will be heard by the same jury that decides liability.

14

4. **MOTION IN LIMINE TO EXCLUDE OPINIONS OF PROPOSED EXPERT, DR. KIRK NEWRING, Filing No. 139**

Chernyy moves to exclude the opinions of Kirk Newring, Ph.D.  Dr. Newring was designated as an expert by Monty Roesler, in his individual capacity.   Roesler has since been dismissed from this lawsuit in his individual capacity.  Accordingly, this motion is denied as moot.

5. **OBJECTION TO THE MAGISTRATE'S ORDER, Filing No. 140**

Defendant Sheriff Moore, in his individual capacity, objects to the Magistrate Judge's order compelling the production of financial information.  *See* Filing No. 127.  The parties appeared before the Magistrate Judge per Chernyy's request for financial documents from Sheriff Moore regarding the claim for punitive damages.  The Magistrate Judge determined that "Plaintiff's motion to compel, Filing No. 106, is granted in part and denied in part.  Defendant Alan Moore will be compelled to participate in discovery relating to his financial condition notwithstanding his potential motion for summary judgment." Filing No. 127 at 6.

Pursuant to NECivR 72.2 and 28 U.S.C. § 636(b)(1)(C), the Court has conducted a de novo review of the record and agrees with the Magistrate Judge.  The Court has carefully reviewed the Magistrate Judge's Order (Filing No. 127), the Motion to Compel (Filing No. 106), and Sheriff Moore's objection to the Magistrate Judge's Order (Filing No. 140).  The Court finds the Order of the Magistrate Judge is adopted in its entirety and the objection is overruled.

6. **MOTION FOR JOINDER, Filing No. 149**

Defendants Sheriff Moore, Saline County, and Monty Roesler, in his official capacity only, move to join co-defendant Monty Roesler's motion in limine, Filing No. 137.

Roesler has been dismissed in his individual capacity from this lawsuit.   However, the Court will permit Sheriff Moore, Saline County, and Monty Roesler, in his official capacity, to join the motion in limine (Filing No. 137) and are hereby substituted as the parties to this motion.  *See supra* note 1.

### 7.  MOTION IN LIMINE TO PROHIBIT PLAINTIFF FROM TESTIFYING AS AN EXPERT, Filing No. 137

Substituted parties, Defendants Sheriff Moore, Saline County, and Monty Roesler, in his official capacity, only, ask to prohibit Chernyy from testifying about her medical conditions as a result of her rape.  Filing No. 137 at 1.  Defendants argue that such testimony attempts to make her an expert in violation of Fed. Rules of Civ. P. 701 and 702.  *Id.*  There is no medical expert designated in this case.

The Court will permit Chernyy to testify about her own symptoms, conditions, and impairments as a result of her rape.  She is a lay witness as to these issues.  The Court will not permit her to testify as to medical diagnosis.  Accordingly, this motion is denied in part and granted in part.

### 8.  MOTION TO STRIKE CHERNYY'S RESPONSE, AND MOTION IN LIMINE, Filing No. 161

Defendants object and move to strike Plaintiff's untimely submission in opposition to Summary Judgment.  Filing No. 161; *see* Filing No. 155.  The submission was due October 25, 2024, but was not filed until October 28, 2024.  Filing No. 162 at 1.  The Court finds that part of the motion should be denied and further finds the filing to be timely.

Also, Defendants object to and move to strike Exhibit J to the Affidavit of Gregory Vincent Alcaro for lack of foundation and hearsay.  Filing No. 162 at 2–3; *see* Filing No. 155-13.  Chernyy argues that she is permitted to offer this as evidence in support of her summary judgment, even if it contains hearsay and lacks foundation.  Filing No. 169 at

3–4.  The Court finds for purposes of this motion that the Exhibit J is permissible for purposes of this summary judgment motion.  ("District courts enjoy 'wide discretion in ruling on the admissibility of proffered evidence'" on a motion for summary judgment.) *Jain v. CVS Pharmacy, Inc.*, 779 F.3d 753, 758 (8th Cir. 2015) (quoting *US Salt, Inc. v. Broken Arrow, Inc.*, 563 F.3d 687, 689 (8th Cir. 2009)).

Finally, Defendants object to and move for an order striking and excluding the Affidavit of Janet M. Perdue (Filing No. 158) because she does not offer opinions regarding relevant standards for 1983 liability and her testimony relates to negligence claims which are not sufficient to prove 1983 liability.  Filing No. 161 at 1.  These arguments have already been set forth numerous times.  *See* Filing No. 117, Filing No. 118, Filing No. 130, Filing No. 131, Filing No. 132.  Defendants argue that Ms. Perdue attempts to give causation opinions, which invade the province of the jury, and her causation opinions are speculative (Filing No. 158 at 4–6, ¶¶ 23, 29, 32, 33, 39), and she attempts to offer new and previously undisclosed opinions (Filing No. 158, ¶¶11–15, 18–21, 23, 27–30, 32–33, 36–39, 43, 49–55).  Filing No. 162 at 3.  The Court has addressed these contentions throughout this Memorandum and Order and need not repeat its findings again.

## 9. <u>MOTION IN LIMINE TO EXCLUDE EVIDENCE AND TESTIMONY REGARDING THE BEVARD INCIDENT, Filing No. 182</u>

Defendants contend that the Angelique Bevard incident is irrelevant and highly prejudicial, and the investigation report is hearsay and contains double hearsay statements.  Filing No. 183 at 3–4; Fed. R. Evid. 401, 402, 403, 801, 802, 803.  Bevard reported that Roesler made inappropriate comments to her.  The prison officials conducted an investigation and concluded that the statements by Bevard were untrue

and that she only made them to try and get transferred.  Filing No. 183 at 2.  Defendants argue that permitting this evidence would be highly prejudicial and irrelevant.  Unfairly prejudicial evidence has also been described as evidence that is "so inflammatory on [its] face as to divert the jury's attention from the material issues in the trial."  *United States v. Adams*, 401 F.3d 886, 900 (8th Cir. 2005).

The Court has carefully reviewed the arguments of both sides and find this motion should be denied at this time.   The statements are highly relevant, hearsay and all.  It is evidence of Roesler's previous conduct, and the manner in which his supervisors handled the investigation.  If during trial these statements become less relevant or overly inflammatory, the defendants may again raise its objections.  However, at this point, the evidence will be admissible, and this motion is denied.

**10.    <u>MOTION FOR SUMMARY, Filing No. 135</u>**

Defendants argue they are entitled to summary judgment because Chernyy cannot prove that an unconstitutional policy or custom caused her constitutional injury.  Filing No. 138 at 1.  Instead, Defendants argue the record shows Saline Jail has a zero-tolerance sexual abuse policy, and it is the jail's policy to immediately investigate and punish sexual abuse after notice is received.  *Id.*  Also, the record shows that Roesler was trained on the jail's zero-tolerance sexual abuse policy that prohibited sexual contact between correctional officers and detainees.  *Id.* at 2.  In fact, the record shows Roesler knew his actions violated the jail's zero-tolerance policy, but he assaulted Chernyy anyway, and then tried to hide it from jail staff.  *Id.*

Furthermore, Defendants contend that Sheriff Moore, in his individual capacity, is cloaked with qualified immunity and entitled to summary judgment because the record

18

shows Sheriff Moore was not Roesler's direct supervisor, and that prior to October 7, 2020, and he did not know Roesler had sexually assaulted Chernyy.  Filing No. 138 at 34. Also, Sheriff Moore was not deliberately indifferent because as soon as he learned about the assault on Chernyy, he ordered an investigation, and when the allegations were substantiated, he immediately terminated Roesler.  Id. at 36.  Eventually, Roesler was prosecuted and sentenced to prison for the assault.

The following is set forth in Defendants' Undisputed Material Facts:

35.     The Jail has a Sexual Assault, Abuse, and Harassment policy. (Moore Affd. ¶¶ 90-91, Ex. G).
36.     The policy is based on the Prison Rape Elimination Act ("PREA").

\*          \*          \*

39.     All new Jail employees are required to go through orientation training when hired, which includes training on the PREA Policy.  (Moore Affd. ¶ 97, Ex. H, pp. 1-2).
40.     Also, each new hire must satisfactorily complete an 80-hour training course at the Nebraska Law Enforcement Training Center in Grand Island, Nebraska, which includes PREA training.  (Moore Affd. ¶¶ 98, Ex. H, pp. 1-2).
41.     Finally, all staff members are required to complete a minimum of 18 hours of annual in-service training.  (Moore Affd. ¶ 99, Ex. H, pp. 2-3).
42.     Roesler went through orientation training, completed the 80-hour training course at the Nebraska Law Enforcement Training Center in Grand Island, Nebraska, and met the 18-hour annual training requirement. (Moore Affd. ¶¶ 122-128, Ex. Q; Guinan Affd. Ex. D-Roesler Depo. 19:9-21:23).
43.     Roesler went through PREA training and trained on the Jail's PREA policy on several occasions while employed at the jail (Moore Affd. ¶ 127, Ex. Q, pp. 1-3).
44.     Roesler passed all PREA training tests at the Training Center. (Guinan Affd. Ex. D-Roesler Depo. 19:9-20:5).

\*          \*          \*

46.     Roesler knew from his PREA training that assaulting Chernyy was a felony and he "didn't want to get caught." (Guinan Affd. Ex. D-Roesler Depo. 54:4-9).

47.    Roesler knew from his PREA training that it was prohibited for him to have a physical relationship with Chernyy.  (Guinan Affd. Ex. D-Roesler Depo. 79:17-22).

48.    Despite his training and despite the fact he knew he was committing a felony, Roesler "made a bad decision and did what I did" and tried to hide it.  (Guinan Affd. Ex. D-Roesler Depo. 54:13-14; 81:5-10).

Filing No. 136 at 6–8.

According to the defendants, the record shows Sheriff Moore does not directly supervise day-to-day operations, he was not Roesler's direct supervisor, and that prior to October 7, 2020, he did not know Roesler had sexually assaulted Chernyy.  Filing No. 138 at 2.  Also, Sheriff Moore argues that he did not have prior knowledge that Roesler posed a substantial risk of harm to Chernyy or other prisoners;  nor was Chernyy, who testified Roesler's conduct was unexpected, and she was "shocked" when it happened. *Id*.

Sheriff Moore oversees the Jail, but the day-to-day operations are handled by the Assistant Jail Administrator ("Assistant Administrator").  Filing No. 138 at 2.  The Assistant Administrator in 2020 was Adam Drake.  *Id*.  The Jail Administrator in 2020, and presently, is Jeff Mulbery.  *Id*.  The Assistant Administrator reports to the Jail Administrator, following the chain of command, and the Jail Administrator reports to Sheriff Moore.  *Id*. at 3.  Sheriff Moore does not directly supervise the correctional officers as they perform their daily operational tasks.  *Id*. at 4.  Instead, this role falls to the shift supervisors.  *Id*.

Each time Chernyy was booked into Saline Jail she received the inmate handbook that sets out the jail's zero-tolerance PREA policy and she signed a "Book Form" each time acknowledging she received a copy of the handbook.  Filing No. 138 at 10; Filing No. 136-1 at 12, Moore Affd. ¶¶ 109–111; Filing No. 136-14, Saline County Corrections Inmate Handbook; Filing No. 136-15, signed inmate acknowledgement of inmate

handbook. Specifically, the PREA policy starts on page 8 and is titled, "The Saline County Law Enforcement Center's Policy on Sexual Abuse" (original emphasis). Filing No. 136-14 at 8–9, Saline County Corrections Inmate Handbook. The first paragraph of the PREA policy says:

> The Saline County Law Enforcement Center will not tolerate sexual abuse in our facility. Inmates, offenders, visitors, volunteers, and employees have a right to living and working areas that are free from any form of sexual abuse. This policy covers sexual abuse by employees, visitors, volunteers, and inmates.

Filing No. 136-14 at 9. The grievance procedure specially advises that "[a]ll inmates shall be able to file a grievance without fear of reprisal for any reason, against any staff member, at any time." *Id*. at 7.

Defendants argue that the official policies in place are sufficient for them to meet their burden of showing a zero tolerance for sexual abuse. Plaintiff argues that although these policies are in place, they are inadequate and not enforced. Similarly, Defendants argue there is no unofficial custom or practice that caused the assault for two reasons: (1) there is no evidence of a continuing, widespread, persistent pattern of unconstitutional misconduct; and (2) no evidence exists that Sheriff Moore was deliberately indifferent to or tacitly authorized Roesler's conduct after he received notice of the assault. Filing No. 138 at 40.

In addition, Defendants argue that to state a plausible municipal liability claim for deliberately indifferent failure to train, Chernyy must prove a supervisor (1) was on notice of a pattern of unconstitutional acts committed by subordinates; (2) was deliberately indifferent to or tacitly authorized the pattern of unconstitutional acts; (3) failed to take sufficient remedial action to address the pattern of unconstitutional acts; and (4) their

failure to remedy the pattern of unconstitutional acts proximately caused [her] injury. *Cole v. Does*, 571 F. Supp. 3d 1033, 1044 (D. Minn. 2021) (quoting *Perkins v. Hastings*, 915 F.3d 512, 524 (8th Cir. 2019)).  Chernyy must show that that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the county can reasonably be said to have been deliberately indifferent to the need." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989).  Chernyy must "demonstrate that the [county] had notice that its procedures were inadequate and likely to result in a violation of constitutional rights." *Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir. 1996), *citing Thelma D. By & Through Delores A. v. Bd. of Educ. of City of St. Louis*, 934 F.2d 929, 934 (8th Cir. 1991).

The Eighth Circuit stated although "[the correctional officer]'s behavior was regrettable, unlawful, unacceptable, and violated jail policies" that did not translate into official capacity liability because "the County's failure to equate (a) [the correctional officer]'s unprofessional and too-friendly nature with female inmates, along with the fact that a co-worker expressed that [the correctional officer]  might possibly have problems working with females, with (b) a conclusion that he was engaging in unlawful and inappropriate sexual behavior with the inmate population, does not serve to establish a constitutional violation." *Marsh*, 902 F.3d at 753; *Mendoza v. United States Immigr. & Customs Enf't*, 849 F.3d 408, 419–20 (8th Cir. 2017).

"To prevail on a § 1983 [individual capacity] claim, a plaintiff must show each individual defendant's personal involvement in the alleged violation." *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010); *see also Torres v. City of St. Louis*, 39 F.4th 494, 504 (8th Cir. 2022) (quoting *White v. Jackson*, 865 F.3d 1064, 1081 (8th Cir. 2017)).  "Liability for

damages for a federal constitutional tort is personal, so each defendant's conduct must be independently assessed." *Faulk v. City of St. Louis, Missouri*, 30 F.4th 739, 744 (8th Cir. 2022) (quoting *Wilson v. Northcutt*, 441 F.3d 586, 591 (8th Cir. 2006)). The doctrine of qualified immunity requires "an individualized analysis of each officer's alleged conduct." *Walton v. Dawson*, 752 F.3d 1109, 1119 (8th Cir. 2014). So, the plaintiff must show that a supervisor was deliberately indifferent to or tacitly authorized the offending acts. *Tlamka v. Serrell*, 244 F.3d 628, 635 (8th Cir. 2001) (quoting *Andrews*, 98 F.3d at 1078). This requires a showing that the supervisor had notice that the training procedures and supervision were inadequate and likely to result in a constitutional violation. *Id.*

"A supervisor is not vicariously liable under 42 U.S.C. § 1983 for an employee's unconstitutional activity." *White v. Holmes*, 21 F.3d 277, 280 (8th Cir. 1994); *see also Parrish*, 594 F.3d 993. In other words, "[s]ection 1983 liability cannot attach to a supervisor merely because a subordinate violated someone's constitutional rights." *Johnson v. City of Ferguson, Missouri*, 926 F.3d 504, 506 (8th Cir. 2019). Supervisors can only "incur liability . . . for their personal involvement in a constitutional violation, or when their corrective inaction amounts to deliberate indifference or tacit authorization of the violative practices." *Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010).

Sheriff Moore argues that he "cannot be held vicariously liable under § 1983" for Roesler's action. Filing No. 138 at 31, citing *L.L. Nelson Enterprises, Inc. v. Cnty. of St. Louis, Mo.*, 673 F.3d 799, 810 (8th Cir. 2012). Sheriff Moore did not supervise the inmates, he did not know of these incidents until October 7, and Roesler was fully trained on the PREA policy. *Id.* at 31–32. This policy was clearly established, and all employees understood that this was the law. *Id.* at 32.

23

"[T]he Eighth Amendment's prohibition against cruel and unusual punishment requires prison officials to 'take reasonable measures to guarantee' inmate safety by protecting them from [violence]." *Young v. Selk*, 508 F.3d 868, 871–72 (8th Cir. 2007) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). However, an official is liable only if "he or she knows that an inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Coleman v. Rahija*, 114 F.3d 778, 785 (8th Cir. 1997).

Chernyy argues that there are a number of significant material facts at issue in this case. First, Janet Perdue will testify that there are a number of safety measures that the defendants should have considered. *See* Filing No. 158. There were no cameras in A-Pod, apparently because that would violate the prisoner's privacy. Filing No. 157 at 14. Yet, there were cameras in the men's pod which seemed to be inapposite of the reasoning for no camera in the women's pod. Filing No. 158 at 7. Further, if total privacy was the goal, the correctional officers were directly across from A-Pod and could clearly see the women in that pod. *Id.* at 8. In addition, the PREA had certain requirements for training of the officers. *Id.* at 2. While the defendants did the initial training, they failed to do so for the next two years. Filing No. 157 at 15. There exists a factual dispute as to whether Sheriff Moore was deliberately indifferent and failed to protect the plaintiff. Plaintiff cites several instances of possible indifference (e.g., previous behavior by Roesler and minimal responses by Sheriff Moore to this behavior; failure to offer training as required by the PREA; and failure to use additional protective devices such as cameras for safety). *Id.* at 3–4. There is also a factual dispute as to whether there was an unofficial custom of not following their own policy. In *Canton*, the Court held that a municipality can be liable

24

for constitutional breaches that occur secondary to inadequate training of its employees if the "failure to train amounts to deliberate indifference to the right of persons." *City of Canton, Ohio*, 489 U.S. 378; *see also Ware v. Jackson Cnty., Mo.*, 150 F.3d 873, 882 (8th Cir. 1998) ("[T]he existence of written policies of a defendant are of no moment in the face of evidence that such policies are neither followed nor enforced.").

The Court finds these facts are sufficient to create material facts between Chernyy and the defendants as to all claims raised by the defendants.  Therefore, Defendants' motion for summary judgment is denied.

**THEREFORE, IT IS ORDERED THAT:**

1. Defendants' motion in limine, Filing No. 117, to preclude the opinions of Plaintiff's expert, Janet Perdue, is denied.

2. Defendants' motion in limine, Filing No. 131, to exclude undisclosed opinions of Janet Perdue is denied.

3. Defendants' motion to bifurcate the issue of punitive damages from the liability and compensatory damages portions of the trial, Filing No. 133, is granted.

4. Chernyy's motion in limine, Filing No. 139, is denied as moot.

5. The objections, Filing No. 140, to the decision of the magistrate judge, Filing No. 127, is overruled and the magistrate judge's decision is adopted in its entirety.

6. Defendants' motion for joinder, Filing No. 149, is granted as set forth in this Memorandum and Order.

7.  The motion in limine, Filing No. 137, is granted as to Alan Moore, Saline County, and Monty Roesler, in his official capacity.  The rest of the motion is denied in part and granted in part as set forth herein.

8.  Defendants' motion to strike, Filing No. 161, is denied as set forth herein.

9.  Defendants' motion in limine, Filing No. 182, is denied as set forth herein.

10. Defendants' motion for summary judgment, Filing No. 135, is denied.

Dated this 3rd day of March, 2025.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge